IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| Denise Robinson, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 20 C 50288 |
| | ) | |
| vs. | ) | |
| | ) | Judge Philip G. Reinhard |
| Walgreen Co., | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

For the reasons stated below, defendant's motion to dismiss [52] is granted. The court finds amendment of the complaint would be futile. Therefore, this case is dismissed with prejudice. Case terminated.

**STATEMENT-OPINION**

Plaintiffs, Denise Robinson, a citizen of Illinois and David Stigall, a citizen of Texas, individually and on behalf of all others similarly situated, bring this action against defendant, Walgreen Co., an Illinois corporation with its principal place of business in Illinois. The amount in controversy is alleged to exceed $5,000,000. Jurisdiction is premised on the Class Action Fairness Act ("CAFA") (28 U.S.C § 1332(d)(2)). Stigall asserts he was injured by defendant's violation of a Texas statute. Robinson asserts she was injured by defendant's violation of two Illinois statutes. Both plaintiffs also seek to recover on an unjust enrichment theory. Defendant moves to dismiss [52] for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).

Defendant operates a chain of drugstores in the United States. This case concerns two products defendant sells under the "Walgreens" label: Infants' Dye-Free Pain & Fever Acetaminophen ("Infants' Product") and Children's Dye-Free Pain & Fever Acetaminophen ("Children's Product"). The claim asserted in plaintiffs' first amended complaint [50] is that defendant mislead them (and consumers generally) into buying the higher-cost Infants' Product even though defendant's lower-cost Children's Product is identically formulated and contains the same amount of acetaminophen in the same dosage amount as the higher-cost Infants' Product. Stigall first purchased the Infants' Product in July of 2013. Robinson first purchased the Infants' Product in April of 2015.

They advance four legal theories[1] to support this claim: (1) Stigall alleges violation of the Texas Deceptive Trade Practices Act (Tex. Bus. & Com. Code § 17.41 et seq) ("DTPA") (Count I); (2) Robinson alleges violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 et seq.) ("ICFA") (Count II); (3) Robinson alleges violation of the Illinois Uniform Deceptive Trade Practices Act (815 ILCS 510/2 et seq.) ("IUDTPA") (Count III); and (4) both plaintiffs allege unjust enrichment (Count IV). The relief they seek in the complaint includes damages, injunctive relief, attorneys' fees, and costs of suit.

---

[1] Plaintiffs' complaint identifies each of these legal theories as a separate cause of action (First-Fourth). For ease of reference, the court will identify each of these as a separate count (I-IV).

1

The Complaint

Acetaminophen is marketed for infants under brand names such as Infants' Tylenol, Pedia Care Fever Reduce Pain Reliever and Triaminic Infants' Syrup Fever Reducer Pain Reliever. "On December 22, 2011, the FDA informed the public that liquid acetaminophen marketed for infants would only be available in 160 mg/5 mL, in order to prevent confusion and accidental acetaminophen toxicity.[2]" *Dkt #* 50, p. 5. Prior to 2011, acetaminophen for infants was only available with concentrations of 80 mg/0.8 mL or 80 mg/mL, while acetaminophen for children was only available with a concentration of 160 mg/5 mL. Since then, infants' and children's acetaminophen are each available only with a concentration of 160 mg/5 mL. Now, the only differences in acetaminophen marketed for infants and acetaminophen marketed for children have been the price and dosing instrument included with the respective products.

The complaint contains a picture of the front of the Infants' Product box. The front of the Infants' Product box displays a drawing of a small child; has "Infants'" written in distinctive yellow letters; states "Compare to Infants' Tylenol Oral Suspension active ingredient." The front of the box, directly under the name of the product, states: "ACETAMINOPHEN 160 mg PER 5 mL PAIN RELIEVER/FEVER REDUCER ORAL SUSPENSION." In a circle near the bottom is written "AGES 2-3 YEARS." Under this circle, appears "2 FL OZ (60 mL)." The front of the box also contains a drawing of a syringe. Directly under the drawing of the syringe is the statement: "Use only with enclosed syringe. See side panel for more information." The side panel of the box in the "directions" states: "find right dose on chart. If possible, use weight to dose; otherwise use age." The side panel also includes a dosing chart which provides that for children under 24 pounds/age under 2 years — a doctor should be asked for proper dosage. For children 24-35 pounds/age 2-3 the dose is 5mL. [3] The packaging does not make any comparison of the Infants' Product to the Children's Product.

The complaint also contains a picture of the front of the Children's Product box. The front of the Children's Product box displays a drawing of a child who appears older than the child on the Infants' Product; has "Children's'" written in distinctive yellow letters; states "Compare to Children's Tylenol Oral Suspension active ingredient." The front of the box, directly under the name of the product states: "ACETAMINOPHEN 160 mg PER 5 mL PAIN RELIEVER/FEVER REDUCER ORAL SUSPENSION." In a circle near the bottom is written "AGES 2-11 YEARS." Under this circle, appears "4 FL OZ (118 mL)." The front of the box also contains a drawing of a dosage cup. The side panel states: "find right dose on chart below. If possible, use weight to dose; otherwise use age." The chart provides that for children under 24 pounds/under 2 years — a doctor should be asked for proper dosage. For children 24-35 pounds/age 2-3 the dose is 5mL. The chart then provides dosages for varying weight and age ranges up to 72-95 pounds/age 11. The packaging does not make any comparison of the Children's Product to the Infants' Product.

The complaint alleges that in the pharmaceutical industry, there are various conventions applied in sub-dividing the pediatric population by age. Generally, "infants" means between zero months and two years and "children" means 2 to 12 years. In defendant's stores, the Infants' Product is placed on shelves next to brand-name pediatric acetaminophen marketed for infants, such as Infants' Tylenol.

Plaintiffs allege that defendant's "deceptive and misleading shelf placement, advertising, marketing, packaging and business practices harness the fear of acetaminophen toxicity to trick consumers, including Plaintiffs, into purchasing and overpaying for Infants' Product when Children's

---

[2] The 2011 Safety Communication and the 2011 Q & A discussed below are the means the FDA used to inform the public of this change.
[3] The complaint does not contain the side panel to either product. However, defendant has provided images of the entire box, including the side panel, for each product. *Dkt #* 53-1, pp. 14, 16. As a document referenced in the complaint the text on the box may be considered on a Rule 12(b)(6) motion. *See Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002).

2

Product would be just as safe and effective at a fraction of the price." *Dkt* # 50, p. 9. Plaintiffs allege they and other consumers are injured by defendant's deceptions because they "are not getting what they pay for — a pediatric pain reliever that is specifically formulated or medicinally unique for infants. Instead, they pay a price premium for a product that is identical to another pediatric product manufactured and marketed by Defendant." *Id.*, pp. 9-10. Both plaintiffs saw the "Infants' Product and, based on the packaging, believed it to be specifically formulated for — or otherwise to be used exclusively for — infants . . . and purchased the Infants' Product from Walgreens because of these representations." *Id.*, pp. 11-12. "Had Defendant not made the misleading and deceptive representation that the Infants' Product was formulated and designed for 'Infants,' nor omitted the fact that the Infants' Product was nothing more than the Children's Product in different packaging, Plaintiffs would not have paid so much money for the Infants' Product or to purchase the Infants' Product at all." *Id.*, p. 12. "Defendant made these material misrepresentations, omissions, and non-disclosures for the express purpose of inducing Plaintiffs and other reasonable consumers to purchase or otherwise pay a premium price for Infants' Product based on the belief that Infants' Product was specifically formulated for infants. Defendant profited by selling Infants' Product to thousands or more of unsuspecting consumers." *Id.*, p.14.

<u>A Brief History of Changes in Pediatric Liquid Acetaminophen Products</u>

A brief history of changes made in pediatric acetaminophen products in 2011 provides some context for the complaint. On December 22, 2011, the FDA issued *FDA Drug Safety Communication: Addition of another concentration of liquid acetaminophen marketed for infants*, https://www.fda.gov/drugs/drug-safety-and-availability/fda-drug-safety-communication-addition-another-concentration-liquid-acetaminophen-marketed-infants. ("2011 Safety Communication"). The 2011 Safety Communication reported that in June 2009, a joint meeting of the FDA Drug Safety and Risk Management Advisory Committee, Nonprescription Drugs Advisory Committee, and the Anesthetic and Life Support Drugs Advisory Committee discussed over-the-counter (OTC) liquid acetaminophen products. "A recommendation was made during this meeting to have only one concentration of pediatric liquid acetaminophen available OTC because products with different concentrations can cause dosing confusion among parents and caregivers that may lead to unintentional over doses in pediatric patients." *Id.* Prior to 2011, liquid acetaminophen marketed for "infants" was only available in 80 mg/0.8 mL or 80 mg/mL concentrations. *Questions and Answers – Important change in concentration for over-the-counter (OTC) liquid acetaminophen marketed for infants,* https://www.fda.gov/drugs/drug-safety-and-availability/questions-and-answers-important-change-concentration-over-counter-otc-liquid-acetaminophen-marketed. ("2011 Q & A"). This formulation marketed as "infant drops" was more concentrated than the acetaminophen oral liquid marketed for children which had a concentration of 160 mg/5 mL. *Over-the-Counter Pediatric Oral Liquid Drug Products Containing Acetaminophen Guidance for Industry*, p. 2, https://www.fda.gov/media/89475/download. ("2015 FDA Guidance").

The 2011 Safety Communication, citing a May 4, 2011 press release from the Consumer Healthcare Products Association (CHPA), noted that due to dosing errors that occurred with the more concentrated infants' formulation, "some manufacturers decided to voluntarily change their liquid acetaminophen products marketed for 'infants' to the same concentration (160mg/5 mL) of liquid acetaminophen products labeled for children." In that press release, CHPA announced a transition, beginning in mid-2011, to convert these products to just one concentration. *OTC Industry Announces Voluntary Transition to One Concentration of Single-Ingredient Pediatric Liquid Acetaminophen Medicines,* https://www.prnewswire.com/news-releases/otc-industry-announces-voluntary-transition-to-one-concentration-of-single-ingredient-pediatric-liquid-acetaminophen-medicines-121328029.html. "This voluntary change means the current children's strength of liquid acetaminophen (160 mg/ 5 mL) will become the only liquid concentration available for all children under 12-years-old, and the current concentrated infant drops will no longer be sold." *Id.* "During the transition, the makers of these medicines also will work with the retailers to ensure that, as the new medicines are introduced, the more concentrated infant drops will be removed from store shelves." *Id.* "The single-concentration liquid

medicines will have additional enhancements to their age-appropriate dosing devices. Specifically, infants' products will have syringes for more accurate dosing and flow restrictors. Children's products, for ages two to under 12-years-old, will continue to offer dosing cups." Id.

The 2011 Safety Communication stated that the change to a single-concentration formulation "will affect the amount of liquid given to an infant, and should be especially noted if someone is accustomed to using the 80 mg/0.8 mL or 80 mg/mL concentrations of liquid acetaminophen."

The 2011 Q & A concerning this change contained the following:

"Q6: Can dosing devices from old and new concentrations of liquid acetaminophen marketed for infants be interchanged?

> A. No. Dosing devices sold with different products should never be interchanged. Droppers measure different volume of medicine compared to oral syringes. Using a dropper to measure the new concentration acetaminophen marketed for infants would result in an incorrect volume of administered medicine. It is important to use the dosing device that comes with acetaminophen product you are using. Never mix and match dosing devices.

> Q7. Now that there is a liquid acetaminophen available in the 160 mg/5 mL concentration for children between the ages of 2 to 12 years old, how do parents and caregivers tell the difference between the products for younger and older children?

> A. Although the product packaging will vary, liquid acetaminophen marketed for younger children will typically state 'Infant Acetaminophen for children 2-3 years,' while liquid acetaminophen marketed for older children will typically state 'Children's Acetaminophen Ages 2-11.' Always check the Drug Facts label to ensure you are selecting the appropriate product based on the age and weight of your child."

> *Questions and Answers – Important change in concentration for over-the-counter (OTC) liquid acetaminophen marketed for infants,* https://www.fda.gov/drugs/drug-safety-and-availability/questions-and-answers-important-change-concentration-over-counter-otc-liquid-acetaminophen-marketed.

Defendant moves to dismiss for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). If the complaint (1) describes the claim in sufficient detail to give the defendant fair notice of what the claim is and the grounds upon which it rests and (2) plausibly suggests that the plaintiff has a right to relief above a speculative level, this requirement is met. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007); see also Ashcroft v, Iqbal, 556 U.S. 662 (2009).

Plaintiffs allege the Infants' Product packaging is misleading because it does not disclose that the Infants' Product and the Children's Product are identical formulations. Defendant argues federal law does not require such a disclosure on the Infants' Product packaging and prohibits any state law to impose such a requirement.

The Food Drug and Cosmetic Act ("FDCA") provides in, relevant part, that "no State or political subdivision of a State may establish or continue in effect any requirement . . . (2) that is different from or in addition to, or that is otherwise not identical with, a requirement under this chapter." 21 U.S.C. § 379r(a)(2). "States can impose requirements that are identical to those imposed by the FDCA, but not different from or more burdensome than those requirements. Thus, to avoid preemption, a state law claim

related to misleading labeling must allege a violation of the FDCA." *Harris v. Topco Associates, LLC*, No. 20 C 4355, 2021 WL 1885981, *3 (N.D. Ill. May 11, 2021).

Under the authority of the FDCA, the Food and Drug Administration ("FDA") regulates the Infants' Product and the Children's Product pursuant to a Tentative Final Monograph ("TFM"), 53 FR 46204-01, published on November 16, 1988, dealing with the regulation of acetaminophen products. A provision of the 2020 CARES Act (21 U.S.C. § 355h(b)(8)(A) "deemed the TFM to have the force of law as a final monograph, [by] providing that tentative monographs for Category I drugs, including acetaminophen, are final administrative orders." *Harris*, 2021 WL 1885981 at *3. Defendant argues that because the TFM does not require a disclosure that the Infants' Product and the Children's Product are identical formulations, plaintiffs are seeking, through resort to state law, to impose a requirement "that is different from or in addition to, or that is otherwise not identical with, a requirement" in the TFM and thus would violate 21 U.S.C. § 379r(a)(2).

Defendant is correct. The TFM contains numerous labeling requirements (set out on pages 46255-46258) dealing with analgesic-antipyretic drug products, including acetaminophen, but none of them require a label for a pediatric acetaminophen product to disclose that it has the same formulation as another pediatric acetaminophen product sold under a different name. Plaintiffs' allegation that the Infants' Product label is misleading because it does not disclose that it has the same formulation as the Children's Product is an attempt to impose a requirement on the labeling of the Infants' Product that is "not identical with" that imposed by the TFM. *Harris*, 2021 WL 1885981 at *4 ("Because the TFM does not require any specific disclaimers concerning infant products nor the interchangeability of the two products at issue, Harris' claims are preempted because she seeks to impose additional obligations on Topco not imposed by the TFM."); *Youngblood v. v. CVS Pharmacy*, No. 2:20-cv-06251, 2021 WL 3700256, *3 (C.D. Cal. Aug. 17, 2021) ("Plaintiffs complain that the infants' product, which is labeled for children between two and three years of age 'does not state that it is . . . the same medicine contained in the Children's Product.' * * * Adjudicating Plaintiffs' claims in their favor would penalize Defendants for declining to include labeling representations beyond what the 1988 TFM requires for children's acetaminophen products.") To the extent plaintiffs are basing their claim that the Infants' Product packaging is misleading on its failure to disclose that its formulation is the same as the Children's Product formulation, plaintiffs' claim is preempted by 21 U.S.C. § 379r(a)(2).

Plaintiffs also argue the use of the term "Infants'" is misleading because it leads a consumer to believe the Infants' Product is specially made for infants and distinct from a product marketed for children. They contend the TFM requires that the label for pediatric liquid acetaminophen display either (1) Children's (trade name of product or generic name of ingredient(s)) or (2) Trade name of product or generic name of ingredient(s)) for Children. By using the term "Infants'" instead of "Children" or "Children's" plaintiffs maintain defendant violated the TFM and therefore, plaintiffs may recover under the applicable state laws for defendant's violation of federal law — the TFM.

Plaintiffs cite *McFall v. Perrigo Company*, No. 2:20-cv-07752-FLA, 2021 WL 2327936 (C.D. Calif. April 15, 2021) which found the TFM did not preempt plaintiffs' claim. *McFall* found a distinction between the TFM's use of "children under 12 years of age," a category *McFall* found includes infants, and "children 2 to under 12 years of age," which it found did not include infants. *Id.* at *10. It found that the TFM required the label of the defendant's product to use the modifier "Children's" not "Infants" on its acetaminophen product labeled for ages 2 to 3 years because the TFM provides for "products labeled only for children 2 to under 12 years of age" that the labeling must contain either (1) "Children's (trade name of product or generic name of ingredients); (2) "Trade name of product or generic name of ingredient(s)) for Children." *Id*. at 9. *McFall* found this understanding of the TFM to be in accord with 21 C.F.R. § 201.19 which provides: "Some question has arisen whether, for the purpose of drug labeling, an infant means a child up to 1 year of age or a child up to 2 years of age. Until the term is more precisely defined by legislation or formal regulation, where the exact meaning of the term is significant,

5

manufacturers should qualify any reference to 'infant' to indicate whether it refers to a child who is not more than 1 year of age, or a child not more than 2 years of age." *Id.*

However, the position taken by the FDA in the 2011 Q & A is at odds with *McFall*'s conclusion on this point. The 2011 Q & A recognizes that the use of "infants" is appropriate for pediatric acetaminophen packaging for younger children when it states that "[a]lthough the product packaging will vary, liquid acetaminophen marketed for younger children will typically state 'Infant Acetaminophen for children 2-3 years." https://www.fda.gov/drugs/drug-safety-and-availability/questions-and-answers-important-change-concentration-over-counter-otc-liquid-acetaminophen-marketed The packaging of the Infants' Product provides this precise information which the FDA said in the 2011 Q & A would typically be provided on the packaging for liquid acetaminophen marketed for younger children. The Infants' Product box states on the front "Infants' Dye-Free Pain & Fever ACETAMINOPHEN" and "AGES 2-3 YEARS." To accept plaintiff's position, that the TFM prohibits use of the word "Infants" on a liquid acetaminophen product package labeled for ages 2 to 3 years, requires accepting that the FDA actively promoted use of labeling contrary to its own TFM. There is no suggestion the FDA has since announced it views the use of "Infant Acetaminophen for children 2-3 years" as inappropriate labeling for a product labeled for children ages 2 to 3 years. Under the circumstances, using "Infants" rather than "Children" on the label to distinguish a product designed for smaller children (syringe) from one designed for older children (cup) is not a violation of the TFM labeling requirement for children ages 2 to under 12. The court respectfully disagrees with *McFall*. Plaintiffs' argument that their claim is not preempted because the use of "Infants" is a mislabeling under the TFM fails. Plaintiffs' claims are preempted by 21 U.S.C. § 379r(a)(2).

Even if plaintiffs' claims based on the argument that the use of the term "Infants'" is misleading because it leads a consumer to believe the Infants' Product is specially made for infants and distinct from a product marketed for children were not preempted, their claims would still fail because the Infants' Product is not deceptive. The elements of a claim under ICFA are: "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to the plaintiff (5) proximately caused by the deception." *Avery v. State Farm Mutual Automobile Insurance Co.*, 835 N.E.2d 801, 856 (Ill. 2005). "To adequately state a claim for a violation of ICFA, the challenged representation must be deceptive." *Fuchs v. Menard*, No. 17-cv-01752, 2017 WL 4339821 * 3 (N.D. Ill. 2017). "[A] court may dismiss an ICFA claim at the pleading stage if the statement is not misleading as a matter of law. A statement is deceptive if it creates a likelihood of deception or has the capacity to deceive, in that it may mislead a 'reasonable consumer,' as understood in light of all the information available to plaintiffs." *Id.*

The elements of a DTPA action are: "(1) the plaintiff is a consumer, (2) the defendant engaged in false, misleading, or deceptive acts, and (3) these acts constituted a producing cause of the consumer's damages." *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 478 (Tex. 1995). "The DTPA's purpose in making representations actionable is to ensure that descriptions of goods or services offered for sale are accurate." *Id.* at 480 (quotation marks and citation omitted). Conduct that constitutes false, misleading, or deceptive acts are enumerated in DTPA section 17.46(b). The complaint alleges violations of subsections of section 17.46(b) which prohibit representing that goods have "sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have (17.46(b)(5)) and advertising goods with intent not to sell them as advertised (17.46(b)(9)). It also alleges a violation of section 17.50(a)(2) which prohibits breach of an express or implied warranty.

The IUDTPA is similar to the DTPA. Plaintiffs allege defendant violated the IUDTPA provisions that prohibit representing goods as having "uses, benefits, or quantities that they do not have" (815 ILCS 510/2(5)), representing goods as being "of a particular standard, quality, or grade or that or that the goods are a particular style or model, if they are of another" (815 ILCS 510/2(7)) or engaging "in

6

any other conduct which similarly creates a likelihood of confusion or misunderstanding." (815 ILCS 510/2(12)).

*Eidmann v. Walgreen Co.*, 522 F. Supp. 3d 634 (N.D. Cal. 2021) involved the same Walgreen's Infants' Product that is at issue here. The *Eidmann* plaintiff claimed that the packaging and marketing of the Infants' Product "mislead customers into believing the product is specially formulated for infants, thereby inducing customers into paying a premium price." *Id.* at 643. The court found the Infants' Product not to be deceptive and dismissed the complaint pursuant to Fed. R. Civ. P. 12(b)(6).

In reviewing the complaint, *Eidmann* observed that "the acetaminophen concentration on the Infants' Product and Children's Product is prominently listed in bold lettering as '160 mg per 5 mL' on the front of the package. In addition, the concentration is also listed in bold lettering on top of the packaging and in highlighted text in the 'Drug Facts' section on the back of the packaging." *Id.* at 644 (record citation omitted). "[T]he Walgreen's packaging indicates the inclusion of the medicine's dosing mechanism — a syringe for infants and a cup for children. In particular, the front of the Infants' Product packaging instructs consumers to 'use only with enclosed syringe. Moreover, the side of the packaging notes the 'enclosed syringe [is] specifically designed for use with this product.' Thus, the infant specific branding is less suggestive of a formulation specially designed for infants, as Eidmann alleges, rather it more reasonably pertains to the infant-specific dosing mechanism included to administer the product." *Id.* (record citations omitted).

"Walgreen's Infants' Product discloses the intended age range as 'ages 2-3 years,' which overlaps with the age range indicated on the Children's Product, which is 'ages 2-11 years.' Therefore, a consumer could readily compare the products and find not only that they contain the same acetaminophen concentration, but also that they can be used by children of identical ages. Moreover, the depictions of children on the Infants' Product and Children's Product are cartoon-like illustrations, not photographs. It is hard to imagine that a reasonable consumer would believe the medicine is specially formulated for infants based on an illustration, especially one so simplistically one-dimensional as the one on the Infants' Product." *Id.* (record citations omitted).

"Eidmann does not dispute the effectiveness of Infants' Product to quell pain and reduce fevers in infants. Rather, he asserts the product name further implies that the medicine is specially formulated for infants. The Court finds this rationale unpersuasive. No reasonable consumer would understand Infants' Product to be specially formulated, in light of the numerous express statements regarding the acetaminophen concentration, overlapping age ranges, and the infant-specific dosing mechanism." *Id.* at 645. "Based on the foregoing, it is not plausible that a significant portion of the general consuming public would be mislead to believe that Infants' Product is specially formulated for infants." *Id.* at 646 (quotation marks and citation omitted).

The court agrees with *Eidmann*'s analysis and adopts it. To further emphasize a point made in *Eidmann*, the Infants' Product is not just the liquid acetaminophen but also the syringe, so the Infants' Product is not identical to the Children's Product even though the liquid acetaminophen formulation of each is the same. Using "Infants'" as the name for the product containing the syringe to differentiate it by name from the product containing the cup is not misleading. Younger children require a smaller dose. The syringe is used to administer that dose accurately. The common definition of "infant" (when used as an adjective) is "intended for young children." https://www.merriam-webster.com/dictionary/infant?utm_campaign=sd&utm_medium=serp&utm_source=jsonld Calling the product "Infants'" suggests the product is for younger children. The FDA, in the 2011 Q & A, recognizes this when it states: "liquid acetaminophen marketed for younger children will typically state 'Infant Acetaminophen for children 2-3 years.'" https://www.fda.gov/drugs/drug-safety-and-availability/questions-and-answers-important-change-concentration-over-counter-otc-liquid-acetaminophen-marketed "No reasonable consumer would understand Infants' Product to be specially

7

formulated, in light of the numerous express statements regarding the acetaminophen concentration, overlapping age ranges, and the infant-specific dosing mechanism." *Eidmann*, 522 F. Supp. 3d at 645.

The infants' Product does not violate the ICFA. It is not deceptive because it would not "mislead a 'reasonable consumer,' as understood in light of all the information available to plaintiffs." *Fuchs*, 2017 WL 4339821 at *3. The Infants' Product does not violate the DTPA because the Infants' Product's packaging is not a deceptive act enumerated in DTPA section 17.46(b). It does not represent that it has "sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities" which it does not have or advertise with intent not to sell the Infants' Product as advertised. It also does not violate section 17.50(a)(2) because it does not breach any express or implied warranty. The Infants' Product is exactly what it says it is.

For a violation of the IUDTPA, a misleading statement also is required. *Galanis v. Starbucks Corporation*, No. 16 C 4705, 2016 WL 6037962, *4 (N.D. Ill. Oct. 14, 2016). Because the Infants' Product does not make a misleading statement, Robinson's claim fails on a IUDTPA violation theory.

Robinson's claim based on an unjust enrichment theory likewise fails. "Under Illinois law, there is no stand-alone claim for unjust enrichment. Instead, Illinois courts describe it as a condition that may be brought about by unlawful or improper conduct as defined by law such as fraud, duress or undue influence." *Benson v. Fannie May Confection Brands, Inc.*, 944 F.3d 639, 648 (7th Cir. 2019) (quotation marks and citations omitted). Relief based on unjust enrichment, therefore is tied to the claimed violations of ICFA and IUDTPA. *Id.* Because Robinson has failed to state a claim upon which relief can be granted based on ICFA and IUDTPA violations, her unjust enrichment theory likewise fails.

Stigall's unjust enrichment theory likewise fails. Under Texas law, a "party may recover under the theory of unjust enrichment when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage." *Heldenfels Brothers, Inc. v. City of corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992). Because the Infants' Product is exactly what it says it is, it is not deceptive and there is no fraud, duress or undue advantage.

For the foregoing reasons, defendant's motion to dismiss [52] is granted.[4] The court finds amendment of the complaint would be futile. Therefore, this case is dismissed with prejudice. Case terminated.

Date: 1/24/2022                                         ENTER:

                                                        _Philip G. Reinhard_
                                                        United States District Court Judge

Electronic Notices. (LC)

---

[4] Because the foregoing is dispositive, the court need not address defendant's other arguments for dismissal.